[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] CONSOLIDATED DECISIONS
The above captioned matters are companion cases before the Court on appeal from two decisions of the Zoning Board of Review of the Town of South Kingstown ("Zoning Board" or "Board"), both issued on April 24, 2000. The appeals stem from a letter from the South Kingstown building official to Y.M.C.A. of Greater Providence ("YMCA") noticing zoning violations on YMCA's Camp Fuller property, which the Zoning Board substantially upheld, and the Board's subsequent issuance of a special use permit allowing YMCA to continue activities which were the subject of the violation letter. In WC No. 00-0225, the objecting neighbors appeal the Board's issuance of a special use permit. In WC No. 00-0226 the objecting neighbors appeal the Board's decision not to uphold all of the violations noticed in the building official's letter. In WC No. 00-0228, YMCA appeals the Board's decision with respect to both the violation letter and the special use permit. Jurisdiction is pursuant to G.L. 1956 § 45-24-69. Because the appeals involve the same parties as the Board's proceedings below, with overlapping facts and law, this Court, Orton, J.,
consolidated these cases on motion by Order entered February 24, 2003. The Order is part of the record in each file.
 FACTS AND PROCEDURE
These zoning appeals center on varied uses of YMCA's Camp Fuller, located on Point Judith Pond in South Kingstown, and described as Lots 4, 5 and 6, Tax Assessor's Map 76-1. Established in 1914, Camp Fuller operated as a summer day and residential youth camp. South Kingstown adopted its zoning ordinance in 1951, zoning Camp Fuller and the surrounding area as rural-residential. Camp Fuller continued to operate the summer camp after enactment of the zoning ordinance, being considered a legal nonconforming use, and remains in operation.
Over the past ninety years, Camp Fuller's facilities, uses and number of campers have increased. At issue in the instant appeals are a series of improvements to the property initiated in the 1990's, and an expanded schedule of operations on the premises. The improvements include construction of a dormitory, expansion of the parking lot, installation of a new septic system, a new heating system, expansion of the dining hall, and establishment of a year round residence and office for the camp director.
The objectors (the neighbors) allege these improvements constitute a methodical change and expansion of the property's use from a summer youth camp to a three season camp, education and conference center. After Camp Fuller operations extended into the spring and fall seasons, the neighbors requested and received town intervention.
In 1999 the town building inspector cited Camp Fuller for multiple violations relating to the previously mentioned improvements. Upon YMCA's appeal, the Zoning Board of Review upheld most of the violations. The Board held its formal written decision in abeyance, allowing YMCA to present additional evidence in support of an application for a special use permit to expand its legal nonconforming use into spring and fall.
Evidence presented to the Board at several hearings tended to show that before 1951 the camp was used solely during the summer months, although YMCA presented limited anecdotal evidence to the contrary. From this record, the Board found that the legal nonconforming use of the camp consisted of a summer camp. The Board found further that after 1951 the premises were used occasionally during the "shoulder seasons" of Spring and Fall, for certain activities. Such use, the board held, constituted an expansion of the property's nonconforming use, requiring relief from the zoning board.
Upon YMCA's application, the Board issued a special use permit allowing Camp Fuller to open April 15 and close November 1 (200 days total). The Board described the permitted dates as an increase in shoulder season use by forty-five days, an increase of 30% over the legal nonconforming use of the property on May 10, 1999. Both sides appeal the board's decision (concerning both the violations and the special use permit).
 STANDARD OF REVIEW
This Court's review of the Zoning Board's decision is governed by G.L. 1956 § 45-24-69(D) which provides that:
 [t]he court shall not substitute its judgment for that of the zoning board of review as to the weight of the evidence on questions of fact. The court may affirm the decision of the zoning board of review or remand the case for further proceedings, or may reverse or modify the decision if substantial rights of the appellant have been prejudiced because of findings, inferences, conclusions, or decisions which are:
 1. In violation of constitutional, statutory, or ordinance provisions;
 2. In excess of the authority granted to the zoning board of review by statute or ordinance;
 3. Made upon unlawful procedure;
 4. Affected by other error of law;
 5. Clearly erroneous in view of the reliable, probative, and substantial evidence of the whole record; or
 6. Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.
When reviewing a zoning board decision, the court "must examine the entire record to determine whether `substantial' evidence exists to support the board's findings." Salve Regina College v. Zoning Board ofReview of Newport, 594 A.2d 878, 880 (R.I. 1991) (citing DeStefano v.Zoning Board of Warwick, 122 R.I. 241, 245; 405 A.2d 1167, 1170 (1979)). "Substantial evidence as used in this context means such relevant evidence that a reasonable mind might accept as adequate to support a conclusion, and means an amount more than a scintilla but less than a preponderance." Caswell v. George Sherman Sand and Gravel Co., Inc.,424 A.2d 646, 647 (R.I. 1981) (citing Apostolou v. Genovesi, 120 R.I. 501,508; 388 A.2d 821, 824-25 (1978)). The reviewing court "examines the record below to determine whether competent evidence exists to support the tribunal's findings." New England Naturist Association v. George,648 A.2d 370, 371 (R.I. 1994) (citing Town of Narragansett v.International Association of Firefighters, AFL-CIO, Local 1589,119 R.I. 506, 508; 380 A.2d 521, 522 (1977)). This Court should exercise restraint in substituting its judgment for the Zoning Board and is compelled to uphold the Zoning Board's decision if the court conscientiously finds that the decision is supported by substantial evidence contained in the record. Mendonsa v. Corey, 495 A.2d 257, 260
(R.I. 1985) (citing Apostolou, 120 R.I. at 507; 388 A.2d at 825).
 ANALYSIS
I. The Violations Decision
On April 24, 2000 the Board issued a "Notice of Decision" directed toward YMCA's appeal from the Building Official's April 14, 1999 decision finding Camp Fuller in violation of several provisions of the Zoning Ordinance of the Town of South Kingstown. The violations noticed by the Building Official included establishment of the year round office, expanding the use of the camp outside the summer season for purposes such as conferences or weekend retreats, and installation of heat to facilitate overnight accommodation in other seasons. The Building Official also noticed illegal creation of a parking lot, use of a garage to store vehicles while zoned only for residential storage, and violation of a variance previously issued for an accessory structure on a lot without a principle structure, for failure to renew the variance or remove the structure. Finally, the Building Official addressed use of a parcel transferred to YMCA in 1985, declaring any legal nonconforming use of the lot is limited to the extent it was previously used by Camp Fuller. The Board decided the appeal on September 29, 1999, voting to record the decision on April 19, 2000. The Board upheld the Building Official's determination concerning the year round office, creation of a parking lot, and the trash containers on Lot 4. The Board overturned the Building Official's decision concerning the garage. Finally, the Board upheld the Building Official's determination that the enumerated violations were consistent with expansion of use, rather than change of use.
YMCA timely appealed those aspects of the decision it found unfavorable, alleging general error.
 Discussion
The Board supported its decision concerning these violations with accompanying findings of fact. Specifically, the Board referred to testimony of Edward Caswell concerning the nature and use of the property in 1951, aerial photographs of the area, and the testimony of the property YMCA's director indicating his lack of personal knowledge as to relevant details surrounding use of the property in 1951.
This Court is compelled to uphold the Zoning Board's decision if it conscientiously finds that the decision is supported by substantial evidence contained in the record. Mendonsa v. Corey, 495 A.2d 257, 260
(R.I. 1985) (citing Apostolou, 120 R.I. at 507; 388 A.2d at 825). Because substantial evidence in the record supports the Board's decision, this Court declines to disturb the Board's decision concerning the violations.
II. The Special Use Permit Decision
On April 19, 2000, the Board granted YMCA's application for a special use permit to expand a legally existing non-conforming camp and provide for a year round office, issuing the "Notice of Decision" on April 24, 2000. The decision articulates the Board's findings of fact, conclusions and reasoning in support thereof. The decision also enumerates several conditions to approval of the special use permit.
From testimony and evidence presented over the course of several hearings, the Board found that a day camp and summer resident camp existed on the premises prior to and since 1951, operating during the summer season. The Board also found that after 1951 the premises were periodically used for recreational, educational and family activities during the Spring and Fall. The Board uses the term "shoulder seasons" to describe the time periods the premises were used beyond the summer camping season. The Board determined the summer season day camp and residential camp were a legal non-conforming use, pursuant to Article 2 of the South Kingstown Zoning Ordinance, and that the shoulder season use was an expansion of the non-conforming use, requiring relief from the Board. Accordingly, the Board limited its decision to review of the impact of shoulder season activity.
The tenor of testimony accepted by the Board supports the premise that intensity of summer season use greatly exceeds that of shoulder season activity. Considering the shoulder season use, the Board found the proposed activities, at maximum capacity, accommodate approximately one-third of the number of people that the summer program supports; that many of the shoulder season programs utilize the premises only on weekends; and, whereas summer program participants rely upon individual automobiles for transportation, buses carry many participants of shoulder season educational programs.
Considering ingress and egress to the property, the Board received conflicting opinions from engineers regarding adequacy of Camp Fuller Road, the only access to the premises. The Board credited testimony from Mr. Frisella, finding his opinion that Camp Fuller Road would support the proposed shoulder season use, to be consistent with the Board members' personal inspection of the road. Accordingly, the Board determined the road to be adequate to support anticipated shoulder season traffic.
The Board also heard conflicting testimony concerning impact on surrounding property values. The Board credited the testimony of Mr. Sahagian, predicting no substantial financial impact on surrounding properties, and also noticed the recent sale of the parcel nearest Camp Fuller for a significant price in a short period of time.
The Board accepted YMCA's reasoning that the proposed special use is consistent with the purpose and intent of the South Kingstown Comprehensive Community Plan and Zoning Ordinance. Specifically, the Board noticed the fact that Camp Fuller is repeatedly mentioned by name in the Comprehensive Plan.
The Board granted YMCA's application for a special use permit by unanimous vote. Specifically, the Board approved a year round office and expansion of the camp's use into the shoulder season.[1] The Board imposed several conditions to the approval. Of greatest import are the Board's definition of the Camp Fuller seasons of operation. The Board defined the summer season as extending from June 1st to Labor Day, limited to 306 participants and 115 staff at one time. The shoulder seasons extend from April 15th through June 1st and from Labor Day through November 1st respectively, limited to 125 persons and 10 staff.[2]
 Discussion
Expansion of Use
The neighbors contend that the Board erred in determining that the additional activities at Camp Fuller constitute expansion rather than a change of use. Any use outside the confines of the summer season, they maintain, is a change in use from a summer camp. YMCA replies that the board was correct in characterizing the additional activities of the camp as intensification or expansion, maintaining that the activities conducted on the premises are similar in all seasons, though conducted with a different clientele.
"A change of use results when the proposed use is `substantially different from the nonconforming use to which the premises were previously put . . .'" Jones v. Rommell, 521 A.2d 543 (R.I. 1987) (quotingSouza v. Zoning Board of Review of Warren, 104 R.I. 697, 699, 248 A.2d 325,327 (1968)). The neighbors point to no evidence in the record tending to show that shoulder season use at the camp substantially differs from summer season use. Rather, access to the activities present during the summer season seem to be exactly what Camp Fuller offers to shoulder season patrons.
The camp director, Jerry Huncosky, addressed the physical improvements at the camp in his testimony. Mr. Huncosky noted that these improvements, notably the septic system, tent cabins and enhancement of the dining hall, were directed towards Camp Fuller's traditional summer camping activity. Specifically, he testified, such improvements were necessary to maintain Camp Fuller's accreditation and to remain competitive with similar camps. Mr. Huncosky also addressed YMCA's use of the term "conference center." That term, he maintained, was a mere marketing statement, reflecting no change in the facilities or activity of the camp.
The Board specifically addressed the change of use question in its decision, and the record reveals consideration of the same at the hearing of September 29, 1999. This Court is compelled to uphold the Zoning Board's decision if it conscientiously finds that the decision is supported by substantial evidence contained in the record. Mendonsa v.Corey, 495 A.2d 257, 260 (R.I. 1985) (citing Apostolou, 120 R.I. at 507;388 A.2d at 825). Because substantial evidence in the record supports the Board's decision, this Court will not disturb the Board's conclusion that there was no change in use.
Granting the Special Use Permit
The neighbors maintain the reliable, probative and substantial evidence of the whole record weighed against granting the special use permit. They allege changes in the character of the property, treacherous traffic conditions on Camp Fuller Road, negative implications on neighboring real estate values, fire hazards and lack of emergency access to the camp. The neighbors also argue that granting of the special use purpose contravenes the purpose and intent of the town's comprehensive plan, which designates the Camp and surrounding properties rural residential.
YMCA responds with contrary arguments concerning the same facts in the record. They note that any neighborhood impact stemming from shoulder season use of Camp Fuller is minimal at best and substantially less than summer use. YMCA also contends the neighbors mischaracterize the Comprehensive plan. YMCA maintains the plan is designed to preserve South Kingstown's character by avoiding "suburbanization" (residential subdivisions, shopping centers and accompanying highways), not prevention of activities like those of Camp Fuller
The South Kingstown Zoning Ordinance allows the Board to grant a special use permit only when the use "will not alter the general character of the surrounding area or impair the intent or purpose of [the] Ordinance or the Comprehensive Plan of the Town." Section 907(A)(2)(c). The Board took great pains to lay out its factual findings and distinguish testimony which it credited from that which it did not. Specific among these were the Board's acceptance of the testimony of Mr. Frisella, the engineer whose opinion accorded with those of the Board Members upon inspection, the testimony of Mr. Sahagian concerning property values, and the Board's notice of the recent lucrative sale of the property nearest the camp. The Board did not ignore the substandard nature of Camp Fuller Road, but rather considered its sufficiency for the lighter shoulder season use. Accordingly, the reliable, substantial and probative evidence of the whole record was sufficient to support issuance of the special use permit.
Similarly, "[i]t is the well-settled law in this state that a zoning board of review is presumed to have knowledge concerning those matters which are related to an effective administration of the zoning ordinance." Smith v. Zoning Board of Review of Warwick 103 R.I. 328,237 A.2d 551 (R.I. 1968). Here the Board relies upon exactly such knowledge, raising the fact in its decision that Camp Fuller is specifically mentioned in the Comprehensive Plan itself, something which apparently none of the real estate experts testifying were aware. "Where it appears from the record that a decision was reached in reliance upon such knowledge, it is considered by this court to constitute legal evidence sufficient to support such a finding." Id. Accordingly, the Board did not err in its determination that issuance of the special use permit did not contravene the purpose and intent of the Comprehensive Plan.
Ultra Vires
The neighbors also argue the expansion awarded is ultra vires, even when based on the Board's own findings of fact. The South Kingstown zoning ordinance allows the Board to permit expansion of an existing lawful nonconforming use, not to exceed 50% of land or intensity at time the use became legally nonconforming. The neighbors maintain that the increased days of operation granted by the Board exceed the fifty percent limitation.
YMCA responds that the intensification permitted by the Board did not exceed 50%, and therefore did not act in excess of its authority or in violation of the South Kingstown Zoning Ordinance. The ordinance provides:
 As a special use in compliance with the provisions of Article 9 of this Ordinance, the lawful nonconforming use of a building, structure or land may be added to, enlarged, expanded or intensified provided that such addition, enlargement, expansion or intensification shall not exceed fifty percent (50%) in excess of the existing floor area, land or intensity used for the nonconforming use at the time the use became legally nonconforming. South Kingstown Zoning Ordinance, Article 2, Section 203 (A)(1999).[3]
The Board entitles Section (A) of the Notice of Decision as "Findings of Fact," though it contains both factual and legal determinations. Prominent in Section A(1) is the Board's identification of the shoulder season use. The treatment the Board gives shoulder season activity in this section includes both finding the fact that shoulder season activity on the premises began later than 1951, and determination that such shoulder season use constituted expansion of a nonconforming use, requiring zoning relief. The relief granted by the Board is the special use permit at issue here, allowing shoulder season activity.
The Board describes the relief granted by the special use permit as a 30% intensification from the nonconforming use existing on May 10, 1999. YMCA maintains the Board calculated the 30% figure by determining what legally nonconforming use existed on May 10, 1999, the date South Kingstown amended its zoning ordinance to include the 50% intensification limit, and from that point increasing the number of days during which the camp could be used.[4] The zoning ordinance, however, specifically describes the benchmark for the 50% limitation as the "intensity used for the nonconforming use at the time the use became legally nonconforming."
Camp Fuller became a legally nonconforming use upon enactment of the zoning ordinance in 1951, not 1999. The Board itself described any
shoulder season use as an expansion requiring relief because there was no shoulder season use prior to enactment of the zoning ordinance. Therefore, any shoulder season use, even that existing on May 10, 1999, is illegally nonconforming and cannot be considered when calculating intensification. Because the Board based its calculation on the 1999 use of Camp Fuller, rather than the 1951 use, it appears that the relief granted by the Board exceeds the 50% intensification limit imposed by the Zoning Ordinance. Accordingly, the Board committed error of law by failing to use Camp Fuller's dates of operation at the time the use became legally nonconforming in 1951 to calculate the expansion allowed by special use permit.
The Board also failed to articulate Camp Fuller's intensity of use in 1951, specifically failing to define the 1951 summer season dates of operation. Therefore, because insufficient findings of fact exist below to properly calculate the actual percentage of intensification from the date the use became legally nonconforming, the matter will be remanded.
 CONCLUSION
In light of the competent evidence adduced before it, the Board's decision to uphold the Building Official's determination of violations is supported by reliable, probative and substantial evidence of the whole record. The Board's determination that the proposed shoulder season use constitutes expansion, rather than change of use; and the Board's method of calculating percentage of expansion, by measuring the days of operation, are similarly supported. Accordingly, this Court affirms those aspects of the Board's decision.
This Court further concludes the Board's findings of fact are inadequate to calculate the percentage of intensification allowed by the special use permit. Accordingly, this matter is remanded to the South Kingstown Zoning Board of Review for the limited purpose of finding facts predicate to determining intensity of use when the property became legally nonconforming in 1951. Specifically, the Board must determine Camp Fuller's dates of operation at the time the use became legally nonconforming in 1951, and amend the relief granted by the special use permit to comply with the 50% limitation. This Court will retain jurisdiction.
[1] YMCA withdrew application for an additional parking lot.
[2] The Board concluded that the 45 day shoulder season expansion pursuant to the special use permit constitutes "an increase of 30% over the legal non-conforming use of the property on May 10, 1999."
[3] The zoning ordinance in effect until May 10, 1999 permitted intensification irrespective of percentage of increase. South Kingstown Zoning Ordinance, Article 4, Section 411 (a)(1994). YMCA filed its appeal and application for a special use permit on May 11, 1999.
[4] The Board estimates that as of May 10, 1999, the camp was occupied from the beginning of May to the end of September, approximately 150 days, to accommodate regular summer camping, maintenance, staff training, and other non-YMCA activities. The Special Use Permit allows an additional 15 days in the Spring and 30 days in the Fall, those 45 days in total constituting an intensification of approximately 30% from the nonconforming use existing on May 10, 1999. Tr. 4/19/00 at 20.
Another method of determining intensification considered by the Board involved calculating "camper days," a figure arrived at by multiplying the number of participants by the number of days. Had the Board used this method, YMCA contends, the permitted expansion would still be less than 50%, because the shoulder season accommodates only about one third of the number of individuals participating in the summer season. The neighbors maintain this method is irrelevant as it was not adopted by the Board. Further, they argue, if adopted, this method would similarly fail to support the expansion awarded. The "camper days" they argue must also be calculated from 1951, and the number of campers has increased to an even greater extent than the days of operation.